**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CHRISTOPHER PETERSON,

                      Plaintiff,

        v.

NATIONAL RAILROAD PASSENGER
CORPORATION; and DOES 1-10, inclusive,

                Defendants.

Case No.:  2:22-cv-05485-MEMF-SK

**ORDER GRANTING IN PART MOTION
FOR SUMMARY JUDGMENT [ECF NO. 44]**

Before the Court is a Motion for Summary Judgement filed by Plaintiff Christopher Peterson. ECF No. 44. For the reasons stated herein, the Court GRANTS IN PART the Motion for Summary Judgment.

I.     **<u>Background</u>**

    a.  **Factual Background**

Plaintiff Christopher Peterson ("Peterson") was employed by Defendant National Railroad Passenger Corporation ("Amtrak") as a locomotive engineer. On August 12, 2018, Peterson went to purchase drugs at a train station along his regular route. He brought a gun with him. Peterson

purchased methamphetamine and smoked it. An altercation followed, and Peterson shot two men. Peterson was arrested and charged with murder, but later acquitted by a jury.

Amtrak held a hearing and determined that Peterson violated Amtrak policies. At the hearing, an Amtrak employee read Peterson's arrest record into the hearing record and made other references to Peterson's arrest and the charges brought against Peterson, despite the acquittal. Amtrak then terminated Peterson. Peterson appealed his termination through his union, and the reviewing board affirmed the initial decision.

Peterson now argues that Amtrak unlawfully used arrest records as a factor in his termination.

### b.  Procedural History

Peterson filed suit in Los Angeles Superior Court on June 27, 2022. ECF No. 1 at 2. Peterson asserts two causes of action: (1) violation of California Labor Code Section 432.7 ("Section 432.7"), and (2) wrongful termination in violation of public policy. *See* ECF No. 1-1 at 51–56 ("Complaint" or "Compl.") ¶¶ 5–17. Amtrak answered on August 3, 2022, and asserted 40 affirmative defenses. *See* ECF No. 1-1 at 5–15 ("Answer"). Amtrak removed to this Court on August 4, 2022. *See id*.

Peterson initially filed a Motion for Summary Judgment on January 12, 2023. ECF No. 20. Peterson filed a Statement of Uncontroverted Facts and various declarations with exhibits alongside this Motion. ECF Nos. 21–23. Defendants filed an opposition on January 26, 2023, along with a Statement of Genuine Disputes, declarations with exhibits, and objections to certain evidence cited by Peterson. The Court denied Peterson's first Motion for Summary Judgement without prejudice on January 30, 2023, noting that Peterson had not filed a joint brief as required by the Court's Standing Order. ECF No. 31.

Peterson filed this Motion for Summary Judgment on June 8, 2023. ECF No. 44 ("Motion" or "Mot."). In accordance with the requirements in the Court's Standing Order, the Motion was briefed and filed jointly by Peterson and Amtrak. *See id.* Peterson filed a Statement of Uncontroverted Facts and Conclusions of Law and Amtrak filed a Statement of Additional Facts in Opposition. ECF No. 45 ("SUF"), ECF No. 44-1 ("SAFO"). The parties also filed several declarations and an appendix.

1   ECF Nos. 44-3–44-5, 46–48, 50. Peterson filed Objections to certain evidence cited by Amtrak and

2   Amtrak filed Objections to certain evidence cited by Peterson. ECF No. 49, ECF No. 44-1.

3   The Court held a hearing on this Motion on August 24, 2023.

4   **II.   <u>Applicable Law</u>**

5   Summary judgment should be granted if "the movant shows that there is no genuine dispute

6   as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

7   56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists &*

8   *Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*,

9   477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could

10  return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

11  A court must view the facts and draw inferences in the manner most favorable to the non-

12  moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil*

13  *Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of

14  persuasion at trial—usually, but not always, a defendant—has both the initial burden of production

15  and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine*

16  *Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the

17  moving party must either: (1) produce evidence negating an essential element of the nonmoving

18  party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving

19  party's case. *Id.*

20  Where a moving party fails to carry its initial burden of production, the nonmoving party has

21  no obligation to produce anything, even if the nonmoving party would have the ultimate burden of

22  persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for

23  summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its

24  burden of production, the burden shifts to the nonmoving party to produce evidence showing a

25  genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances,

26  the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the

27  depositions, answers to interrogatories, and admissions on file, designate specific facts showing that

28  there is no genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal

quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252.   To carry its ultimate burden of persuasion on the motion, the moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

Where parties file cross motions for summary judgment on the same issue, the court must consider both motions and all evidence submitted by both parties. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). "[E]ach motion must be considered on its own merits." *Id.* Even if both parties assert that no genuine disputes of material fact exist, the court must still review the record and determine that there are no disputes of material fact before granting summary judgment to either party. *See id.*

### III.   Findings of Fact[1]

---

[1] The facts set forth below are taken from the parties' Statements of Uncontroverted Facts and Conclusions of Law and the evidence cited in each. *See* SUF; SAFO. To the extent that any statements of fact are omitted, the

1   The Court finds the following material facts are established for trial[2] under Federal Rules of

2   Civil Procedure 56(a) and 56(g):

3   Prior to his termination, Peterson worked as a locomotive engineer for Amtrak operating

4   Metrolink passenger trains. SUF ¶¶ 1–2. Peterson was required to comply with various Amtrak

5   policies, including Amtrak's Core Values, Standards of Excellence, and General Code of Operation

6   Rules. SAFO ¶ 51.

7   Peterson was a member of the Brotherhood of Locomotive Engineers and Trainmen. SAFO ¶

8   57. The terms of his employment were governed by a Collective Bargaining Agreement (the

9   "CBA"). *Id.* The CBA included rules that governed investigatory hearings and discipline. *Id.* ¶ 58.

10  Peterson had struggled with drug addiction in his past. SUF ¶ 3.  Peterson relapsed in 2016,

11  sought help through Amtrak's Employee Assistance Program ("EAP"), went to rehab, and returned

12  to work. *Id.* ¶¶ 3–4.

13  As of August 2018, Peterson operated a train that made daily stops at the Metrolink Station

14  in Pomona, CA ("Pomona Station"). *Id.* ¶¶ 6, 8. Peterson would remain on board the train when it

15  stopped at Pomona Station. *Id.* ¶ 10. Peterson was aware that drug transactions took place at Pomona

16  Station and witnessed what he understood to be such transactions. *Id.* ¶ 11.

17  On August 12, 2018, Peterson decided to purchase drugs at Pomona Station. *Id.* ¶ 12; SAFO

18  ¶ 54. He traveled to the station at night, while off duty, intending to purchase drugs. *Id.* Peterson

19  brought a gun with him to the station. SUF ¶ 13. He purchased methamphetamine and smoked it

20

21  _____

Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set
22  below were allegedly disputed by the opposing party, the Court concludes that no actual dispute exists or that
the adopted language resolves the dispute.

23  In making these Findings of Fact, the Court considered Peterson's and Amtrak's Evidentiary Objections. ECF
Nos. 49, 44-1. The Court did not find any evidence that either party objected to essential to finding any fact
24  stated herein, except where explicitly stated otherwise. The Court need not reach any objection except those
addressed in this Order.
25

[2] Amtrak asserts that facts the parties agreed were undisputed in the SUF are undisputed "for the purposes of
26  this summary judgment motion **only**," suggesting that Amtrak may later dispute some facts that Amtrak
conceded were undisputed. *See* SUF ¶ 1 n.1. The Court sees no basis for this assertion, and Amtrak points to
27  no authority suggesting that a party may agree that a fact is undisputed on summary judgment (and provide no
evidence disputing it), but later dispute the fact at trial. Pursuant to Rule 56(g), the Court finds that these facts
28  are "established in the case." *See* Fed. R. Civ. P. 56(g).

near the platform. *Id.* ¶ 14. An altercation occurred between Peterson and two other men, and Peterson shot the two men, then left the station. *Id.* ¶ 15. Peterson called the police and turned himself in. *Id.* ¶ 16. He was arrested and charged with two counts of murder. *Id.*

Amtrak conducted an investigation into this incident. SAFO ¶ 56. On August 17, 2018, Peterson's supervisor Kevin Banks ("Banks") sent Peterson a letter (the "Banks Letter"[3]). SUF ¶ 17; *see also* ECF No. 46-1. The letter directed Peterson to "attend a formal investigation" on August 23, 2018. SUF ¶ 17; *see also* ECF No. 46-1. It explained that "the purpose of the investigation" was "to determine that [sic] facts and your responsibility, if any" regarding the August 12 incident at Pomona Station. ECF No. 46-1. Under the heading "specifics," the letter added that:

> As reported in various news media outlets, naming Amtrak as your employer, you were arrested and charged with two counts of premeditated murder . . . This alleged behavior, public exposure, and your lack of availability for duty is contrary to Amtrak's Core Values, Standards of Excellence, and General Code of Operating Rules. Your actions, arrest, and related media reports brings [sic] and negatively impacts [sic] Amtrak's public interest and business.

ECF No. 46-1 at 1. The letter laid out six "[c]harge[s]" against Peterson for "alleged violations" of certain of Amtrak's Standards of Excellence and General Code of Operating Rules as follows: [1] Standards of Excellence Subsection "Personal and Professional Conduct," which prohibits "activities that compromise the safety, satisfaction and well-being" of customers, the public, or Amtrak; [2] Standards of Excellence Subsection "Integrity," which requires honesty, following the law, and ethical conduct; [3] Standards of Excellence Subsection "Trust and Honesty," which requires honesty and conduct that reflects well upon Amtrak; [4] Standards of Excellence Subsection "Attending to Duties," which prohibits behavior that distracts or prevents employees from attending to duties [5] General Code of Operating Rules Section 1.6, "Conduct," which states that employees "must not be" "[n]egligent" or "[i]mmoral;" and [6] General Code

---

[3] Peterson describes this as a "Disciplinary Notice," while Amtrak notes that the letter is titled "Notice of Formal Investigation." *See* SUF ¶ 17.

Amtrak objects to Peterson's introduction of the Banks Letter on the grounds that it "lacks foundation" based on the fact that Peterson testified that it was a "Disciplinary Notice" when that was not its actual title. *See* ECF No. 44-1 ¶ 4. The Court finds this objection baseless and overrules it. The Court will consider the Banks Letter as evidence.

of Operating Rules Section 1.9 "Respect of Railroad Company," which states that employees must behave such that "the railroad will not be criticized for [employees'] actions." *Id.* at 2. The letter also stated that Peterson would be "withheld from service" pending the investigation, would be permitted to "produce any witness," and could be accompanied by a union representative in the investigation. *Id.* at 3.

Peterson was in jail at the time he received this letter. SUF ¶ 17. Amtrak agreed to postpone the hearing until Peterson's criminal proceedings resolved. *Id.* ¶ 19. Peterson remained in jail until his trial. *Id.* ¶ 20. On January 22, 2020, a jury found Peterson not guilty. *Id.* ¶ 21.

Peterson then sought to return to work. *Id.* ¶ 22. Amtrak informed Peterson, via a second letter, that the hearing would be on November 9, 2020. *Id.* ¶ 23. Amtrak made no changes to the charges in the original Banks Letter. *Id.* ¶ 24.

Peterson attended the hearing on November 9, 2020. *Id.* ¶ 25. Amtrak employee Timothy Miller ("Miller") served as hearing officer, and Amtrak manager Randy Nabors ("Nabors") served as the charging officer. *Id.* ¶ 26. Peterson was accompanied by a non-attorney union representative, Chad Skinner ("Skinner"). Banks testified at the hearing and—at the request of Nabors—read into the hearing record the online record of Peterson's arrest. *Id.* ¶ 27; *see also* ECF No. 46-4 at 20–21 (Banks: "Arrested 08-12-2018. Arrest time: 09:33 . . . Agency description: Pomona PD . . . Last Name: Peterson. First Name: Christopher."). Banks also read into the hearing record certain portions of the transcript of Peterson's criminal trial. SUF ¶ 28.[4] After Skinner (on Peterson's behalf) objected to the reading of the trial transcripts, charging officer Nabor argued that "we need to utilize this documentation for the simple reason it's not for the actual criminal case itself, but the immoral acts that's outlined in the charges." ECF No. 46-4 at 22. Hearing officer Miller examined the document and determined that certain portions were relevant to the investigation while other

_____

[4] In response to Peterson's submission of the facts that Banks read into the hearing record Peterson's arrest record and criminal transcript, Amtrak argues that the hearing officer, Miller, "prohibited any references to or testimony from the criminal trial that were not directly relevant to determine the facts and [Peterson's] responsibility" for violations of Amtrak's policies. SUF ¶¶ 27, 28. The record does not fully support such a finding of fact. While the record demonstrates that Miller attempted to exclude testimony that was not relevant, the Court is not well positioned to evaluate whether Miller's determination of relevance was correct. Therefore, the Court will not find as fact that Miller prohibited references to testimony that was not relevant.

portions were not, and allowed Banks to testify only as to the portions Miller determined were relevant.[5] *Id.* at 22–25. Banks also discussed media coverage of the incident at Pomona Station and of Peterson's arrest. *Id.* ¶ 29. Another witness testified as to the negative impact media reports of the incident and Peterson's arrest had on Amtrak. *Id.* ¶ 30. In closing argument, Nabors argued (with respect to charge no. 2, violation of "Integrity" subsection) that "Peterson was not in compliance . . . he was charged with a double murder, bringing undue discredit to Amtrak." *Id.* ¶ 31; *see also* ECF No. 46-4 at 72. Nabor's closing statement also covered other issues, including news media coverage, and the fact that Peterson's actions "prevented him from attending his duties." ECF No. 46-4 at 72–73. Nabor mentioned drug use as well, but Miller struck "the reference of the drugs" from the record. SUF ¶ 32; *see also* ECF No. 46-4 at 72.

On November 17, 2020, Miller sent Peterson a letter entitled "Decision," which stated that Amtrak had proven its case. SUF ¶ 33; *see also* ECF No. 46-7. In the first sentence of the letter, it stated "[a]s reported in various news media outlets, naming Amtrak as your employer, you were arrested and charged with two counts of premeditated murder . . . ." ECF No. 46-7. Miller found that Peterson had violated Amtrak's Standards of Excellence and General Code of Operating Rules. *Id.* On November 18, 2020, Amtrak manager Michelle Caudill ("Caudill") sent Peterson a letter stating that Peterson's employment at Amtrak had been terminated "based on the decision of Hearing Officer Miller." SUF ¶ 34. Caudill is not an officer, director, or managing agent of Amtrak, and does not have the authority to make decisions at the corporate level or determine corporate policy. SAFO ¶ 83.

Union representatives appealed Peterson's termination on November 30, 2020. SUF ¶ 42. On January 15, 2021, Amtrak's Lead Labor Relations Specialist Aaron Parker ("Parker") denied Peterson's appeal, noting that "the sole responsibility for determining whether charges are proven

---

[5] There is no indication that Miller considered Section 432.7—which prohibits employers from "utiliz[ing]" "any record of arrest or detention that did not result in conviction" "as a factor in determining any condition of employment"—in making his determination of what portions of the arrest record (if any) could be read into the hearing record. *See* ECF No. 46-4 at 22–25. Skinner did not point to Section 432.7 in raising his objection. *See id.*

rests with the hearing officer." SUF ¶ 43; *see also* ECF No. 46-10 at 3. Parker did not mention Section 432.7 in making his decision. SUF ¶ 44; *see also* ECF No. 46-10.

On January 19, 2022, Union representatives requested a hearing regarding Peterson's termination before the Special Board of Adjustment ("SBA"). SUF ¶ 45. On September 13, 2021, Amtrak submitted briefing to the SBA, which stated in its opening sentence that "Peterson was terminated after it was accurately reported in the news that he was arrested for the fatal shooting of two people on a train platform in Pomona, CA." SUF ¶ 46; *see also* ECF No. 46-12 at 1. The SBA denied Peterson's claim, noting that a railroad's discipline decision will not be modified unless the decision is shown to be "arbitrary, capricious, or discriminatory." SUF ¶ 48; *see also* ECF No. 46-13. The SBA did not mention Section 432.7 in making its decision. SUF ¶ 49; *see also* ECF No. 46-13.

### IV.   **Discussion**

#### A.  **Peterson is entitled to summary judgment on his Section 432.7 claim (first cause of action)**

Peterson moves for summary judgment on the grounds that uncontroverted evidence shows that Peterson's arrest records, and the facts that he was arrested and detained, were used as factors in his termination, in violation of Section 432.7. Amtrak argues in response that (1) the Section 432.7 claim is preempted by the Railway Labor Act ("RLA"); (2) Peterson is precluded from challenging his termination in Court on these grounds after it was upheld by the SBA; and (3) Amtrak did not use the arrest record or the arrest itself as a factor, and rather conducted an independent investigation. Amtrak seeks summary judgment that Peterson's Section 432.7 claim fails.

For the reasons stated below, the Court finds that the uncontroverted evidence shows that Amtrak used Peterson's arrest as a factor in his termination. Amtrak's other arguments fail. Hence, Peterson will be granted summary judgment on this claim, and Amtrak will be denied summary judgment on this claim.

i.   <u>Amtrak unlawfully considered Peterson's arrest as a factor in his termination.</u>

Under California law, an employer "shall not seek from any source whatsoever, or utilize, as a factor in determining any condition of employment including hiring . . . any record of arrest or

1   detention that did not result in conviction." Cal. Lab. Code § 432.7(a)(1). The term "record" is

2   interpreted broadly, according to its "commonsense meaning," to encompass "an account, as of

3   information or facts, set down especially in writing as a means of preserving knowledge or

4   information or data on a particular subject collected and preserved." *Garcia-Brower v. Premier Auto.*

5   *Imports of CA, LLC*, 269 Cal. Rptr. 3d 856, 868 (Cal. Ct. App. 2020) (internal quotation marks and

6   alterations omitted). To prove a violation, a plaintiff must show that his or her employer "utilized as

7   a factor in terminating [the employee's] employment any record concerning a conviction that has

8   been judicially dismissed." *Id.* at 865. Further, Section 432.7 applies to more than just records of

9   arrest or detention—the only California appellate decision to address the issue opined that Section

10  432.7 also prohibits an employer from "utiliz[ing] *the information* of a mere arrest for disciplinary

11  purposes." *Pitman v. City of Oakland*, 243 Cal. Rptr. 306, 309 (Cal. Ct. App. 1988) (emphasis

12  added).[6] The court did "not read the statute as authorizing the utilization of an arrest alone as a factor

13  in determining to dismiss an employee" *Id.* "To hold otherwise would violate the fundamental

14  presumption of a suspect's innocence prior to the contrary being proved." *Id.* In other words, even if

15  the employer does not actually review an arrest record, punishing an employee for the fact that he

16  was arrested or detained is unlawful if the arrest or detention did not lead to conviction. *See id.*

17      However, Section 432.7 "does not prohibit an employer from disciplining an employee

18  where the employer independently investigates the conduct giving rise to the arrest or detention."

19  *Pinheiro v. Civ. Serv. Com. for Cnty. of Fresno*, 200 Cal. Rptr. 3d 525, 535 n.3 (2016). If an

20  employer independently investigates and determines that the employee's conduct warranted

21  termination, the fact that this conduct involved arrest or detention "does not bring the [employer's]

22

23  _____

24  [6] It appears that the quoted portion of *Pitman* may be dicta, as the *Pitman* court ultimately held—after
    discussing the meaning and applicability of Section 432.7, that "we nevertheless find" that the demur should

25  be sustained because *Pitman* plaintiff failed to (and could not) "affirmatively allege that the arrest did not
    result in a conviction." *Pitman*, 243 Cal. Rptr. at 309. Nevertheless, given the dearth of other authority on this

26  issue, the Court will follow the *Pitman* court's interpretation of Section 432.7. Consistent with that court's
    reasoning, it would make little sense to prohibit an employer from reviewing arrest records that did not result

27  in conviction, but nevertheless allow an employer to punish an employee for the fact that the employee was
    arrested and not convicted. The Court also notes that the Ninth Circuit—in an unpublished and non-citable

28  decision (*See* Ninth Circuit Rule 36–3)—similarly followed *Pitman* on this point. *See Piutau v. Fed. Express
    Corp.*, 114 F. App'x 781, 782 (9th Cir. 2004).

1   subsequent decision to terminate appellant within the proscription of Labor Code section 432.7."

2   *Cranston v. City of Richmond*, 710 P.2d 845, 857 (Cal. 1985).[7]

3        Here, the uncontroverted evidence shows that Amtrak employee Nabors entered the arrest

4   record into the record as an exhibit and Amtrak employee Banks, Peterson's supervisor, read

5   portions of Peterson's arrest record into the hearing record on November 9, 2020. *See* SUF ¶ 27; *see*

6   *also* ECF No. 46-4 at 20–21 (Banks: "Arrested 08-12-2018. Arrest time: 09:33 . . . Agency

7   description: Pomona PD . . . Last Name: Peterson. First Name: Christopher."). There is no doubt that

8   this qualified as a "record of arrest" as interpreted broadly under Section 432.7. *See Garcia-Brower*,

9   269 Cal. Rptr. 3d at 868. Nor is there any dispute that the arrest did not lead to a conviction. SUF ¶

10  21. Amtrak's decision to introduce the arrest record as an exhibit and read it into the record—in the

11  context of the entire hearing and decision—constituted a clear violation of Section 432.7.[8]

12       Amtrak's arguments to the contrary are all unavailing.

13       First, Amtrak asserts repeatedly that the arrest was only referred to as the *reason* the

14  investigation was triggered. *See, e.g.*, Mot. at 8 ("Plaintiff's arrest is only referenced once in the

15  three-page Notice of Formal Investigation, and this reference occurs in the introductory paragraph

16  *noting why an investigation was being commenced in the first place*." (emphasis added)), 11

17  ("During the approximately four-hour Investigatory Hearing, the word 'arrest' was only used ten

18

19

20  [7] Amtrak also cites to *Cronin v. Pac. Gas & Elec. Co.*, an unpublished decision. In *Cronin*, the court held that
    an employer did not violate Section 432.7 where the employer conducted an investigation and generated a

21  report, and the investigation relied in part on an arrest record that did not lead to conviction, but the
    employer's final decision was based only on the report of its own investigation. *See Cronin v. Pac. Gas &*

22  *Elec. Co.*, No. A162715, 2022 WL 17748920, *4–*5 (Cal. Ct. App. Dec. 19, 2022); Mot. at 30. *Cronin*
    suggests that an employer may rely on arrest records that did not lead to conviction—which Section 432.7

23  squarely prohibits—so long as the employer generates an independent report based on the arrest record as an
    intermediary step. *See id. Cronin* is an unpublished decision of a California Court of Appeals. *See id.* Under

24  the California Rules of Court, unpublished decisions from California Courts of Appeals "must not be cited or
    relied on by a court or a party in any other action" except in limited circumstances that do not apply here. *See*

25  Cal. R. Ct. 8.115. Not only are unpublished California decisions non-citable, litigants who cite such decisions
    in California court may be subject to sanctions. *See Alicia T. v. Cnty. of Los Angeles*, 271 Cal. Rptr. 513, 521–

26  22 (Cal. Ct. App. 1990). Given *Cronin*'s non-citable status, the Court places no reliance on it.

27  [8] As discussed below, the Court's decision is based upon the context of this specific hearing and decision. It is
    possible that there might be a factual scenario where the introduction of an arrest record as an exhibit and

28  reading it into the record might not constitute a violation of Section 432.7. This Court's determination is
    simply that this is not that factual scenario.

total times. Three of those uses were when individuals merely read the exact language of the Notice of Formal Investigation's introductory paragraph (*where it showed why an investigation was triggered*) . . . ."(emphasis added) (citations omitted)), 12–13 ("The [Investigatory Hearing] decision only referenced Plaintiff's arrest a single time in the introductory paragraph, which merely restated, word for word, the language of the introductory paragraph from the Notice of Formal Investigation *setting forth the reason why the investigation was triggered*, and again, did not mention Plaintiff's record of detention." (emphasis added). These assertions are plainly contrary to the undisputed facts in the record. The Notice of Investigation does not point to the arrest as the reason the investigation was triggered or in any way attempt to identify how or why the investigation was triggered. The introductory paragraph Amtrak repeatedly cites to reads as follows:

> As reported in various news media outlets, naming Amtrak as your employer, you were arrested and charged with two counts of premeditated murder . . . This alleged behavior, public exposure, and your lack of availability for duty is contrary to Amtrak's Core Values, Standards of Excellence, and General Code of Operating Rules. *Your actions, arrest, and related media reports brings [sic] and negatively impacts [sic] Amtrak's public interest and business.*

ECF No. 46-1 at 1 (emphasis added). As this excerpt makes clear, with respect to the arrest, the letter simply states "[y]our . . . arrest brings and negatively impacts Amtrak's public interest and business." *Id.* Thus, Amtrak is wrong when it asserts that the arrest was merely referred to as the triggering event, and when it argues as a result that Section 432.7 was not violated.[9]  Second, Amtrak asserts that Nabors made it clear in the hearing that the arrest was not the *basis* of the charges and argues that therefore there was no Section 432.7 violation. *See, e.g.*, Mot. at 11 ("Amtrak Charging Officer, Randy Nabors, made several statements during the Investigatory Hearing further confirming that the investigation was *not about Plaintiff's record of arrest* or criminal charges, but about Plaintiff's conduct that violated Amtrak policy." (emphasis added)). Amtrak's assertions regarding Nabor's "confirmations" are contrary to the undisputed facts in the record. In the portions of the hearing cited by Amtrak, Nabors did *not* confirm that the investigation

---

[9] The Court makes no finding as to whether reference to an arrest as merely the trigger for an investigation would violate the statute. Those facts are not before this Court.

was not about Plaintiff's record of arrest, he merely averred that the hearing was not about the murder case. Transcript at 6 ("And, also, the case at hand is irrelevant to this particular case. We're not holding a hearing for the trial that he had at Superior Court and was found not guilty of. That's not what we are here for. We're here for the charges that is outlined from Charge 1 to Charge 6, and not dealing with the murder case that he was tried for."), 9 ("As stated before, this hearing is not pertinent to the actual murder case, the, the, I guess adjudication of Mr. Peterson. It's in response to his immoral acts, and, as we proceed on with the case, it'll be outlined and shown, from Charge 1 to Charge 6, that he was not incompliance with the Standards of Excellence and was not attending to his duties, and he had numerous alleged violations that we will prove during this hearing."). Furthermore, and perhaps more importantly, Section 432.7 does not merely prohibit the use of an arrest as the basis for charges. It prohibits "*utiliz[ing], as a factor* in determining any condition of employment including . . . termination . . . , *any record of arrest* or detention that did not result in conviction." *Pitman*, 243 Cal. Rptr. at 309. Thus, Amtrak is wrong both in its characterization of Nabor's position at the investigatory hearing and about its implications for whether it violated the statute.

Third, apparently recognizing that it must contend with the fact that the actual arrest record was actually admitted as an exhibit during the Investigatory Hearing, Amtrak asserts "the records entered into evidence by Kevin Banks were not used for the fact of the arrest or criminal charges, *but for the underlying conduct by Plaintiff that was outlined in the records* and Plaintiff's own public admissions o the underlying conduct that may have violated Amtrak's policies." Defendant's Response to Plaintiff's SUF 29; *see also* Mot. at 12, 33. Not only does this appear to be belied by the record, *see* Transcript at 20-21, but even if it were true, this would be a violation of the statute. Put another way, using the arrest record for the underlying conduct that was outlined in the record—as Amtrak claims it did—is still "*utiliz[ing], as a factor* in determining any condition of employment including . . . termination . . . , *any record of arrest* or detention that did not result in conviction."

Other uncontroverted facts also show that Amtrak considered as a factor *the fact* that Peterson was arrested, which further demonstrates Amtrak's liability. *See Pitman*, 243 Cal. Rptr. at 309. As discussed above, with respect to the arrest, the Banks latter stated "[y]our . . . arrest brings

and negatively impacts Amtrak's public interest and business." ECF No. 46-1 at 1. Miller's letter stating his decision contained the same language, this time as a finding: "Your . . . arrest brings discredit to Amtrak and negatively impacts Amtrak's public interest and business." ECF No. 46-7. Although Amtrak attempts to frame this as merely repeating the language of the Banks letter, it is not written as a quote; it is a finding by the Hearing Officer himself. *See id.* This evidence shows that Amtrak considered the fact of Peterson's arrest as a factor in making its decision.[10] No reasonable juror could hold otherwise on this record.

In the hearing, Amtrak disputed the Court's interpretation of Section 432.7. Amtrak argued that the statute's purpose was to prohibit employers from using an arrest alone—without further investigation—to discipline an employee. Amtrak cited *Pitman*, which held that an employer cannot "utilize the information of a mere arrest for disciplinary purposes." *See Pitman*, 243 Cal. Rptr. at 309. Amtrak reads this quote (and *Pitman* as whole) as suggesting that an employer may consider an arrest but Section 432.7 only prohibits disciplining an employee for the *mere fact* the employee was arrested *without conducting further investigation*.

The plain text of Section 432.7 does not support Amtrak's interpretation. An employer may not "utilize" an arrest record "as a factor in determining any condition of employment." Cal. Lab. Code § 432.7(a)(1). Nothing in the statute suggests that an employer may utilize an arrest record so long as the employer also conducts an independent investigation. The Court reads the quoted language from *Pitman* as describing the outer bounds of what Section 432.7 covers—even if a written record of arrest is not considered, the employer may not consider the "information of a mere arrest." *See Pitman*, 243 Cal. Rptr. at 309. This does not suggest that an employer may discipline an employee based on a record of arrest if an independent investigation is also conducted. While precedent makes clear that if an employer conducts an independent investigation, the fact that the

---

[10] Peterson also argues that by citing his absence from work, Amtrak was punishing Peterson for his detention, which would provide another basis for finding a violation of Section 432.7. *See* Mot. at 19. Amtrak argues in response, citing to cases that discussed other laws, that "[n]o statute authorizes an employee to indefinitely miss work." Mot. at 34. The Court is not aware of authority addressing whether Section 432.7 prohibits an employer from disciplining an employee for missing work while detained and need not reach this issue given the other evidence.

employee was arrested does not shield the employee, no authority suggests that an independent investigation precludes liability where an employer utilized an arrest record as a factor in determining discipline. *See Cranston v. City of Richmond*, 710 P.2d at 857 (employee's termination "was based on the [employer's] independent investigation of the facts . . . that this incident happened to involve a 'detention' (if such it was) by police officers does not bring the [employer's] subsequent decision to terminate appellant within the proscription of Labor Code section 432.7.").

The uncontroverted facts establish that Amtrak conducted some degree of an independent investigation, as Amtrak notes.[11] *See* Mot. at 31. But an independent investigation alone is not a defense to a Section 432.7 claim if the evidence shows that the employer "utilized" the "record of arrest" "as a factor." Where courts have found no liability based on an independent investigation, there was also no evidence that the employer used the arrest as a factor. *See, e.g.*, *Cranston*, 710 P.2d at 857 (no violation of Section 432.7 where "discharge was based on the [the employer's] independent investigation" of an incident that involved detention). The facts here are distinguishable. Although Amtrak conducted an investigation, it also considered the arrest and record of arrest as factors in its decision. In doing so, Amtrak violated the law. No reasonable juror could find otherwise on these facts.

        ii.    <u>Peterson's claims are not preempted by the RLA.</u>

Amtrak argues that even if it violated Section 432.7, Peterson's claim is preempted by federal law. This argument fails.

Congress enacted the Railway Labor Act to "promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). State law claims are preempted by the RLA if they either "grow out of grievances or out of the interpretation or application of [collective bargaining] agreements covering rates of pay, rules, or working conditions" or "involve controversies over the meaning of an

---

[11] Amtrak argued in the hearing that, at minimum, the Court should allow a jury to determine whether Amtrak conducted an independent investigation. The Court finds that, to the extent there is any dispute of this fact, it is not relevant. Amtrak utilized the arrest record in determining discipline, which is squarely prohibited by Section 432.7 as discussed above.

existing collective bargaining agreement in a particular fact situation." *Id.* (internal alterations and quotations omitted). This preemption is "limited." *Alaska Airlines Inc. v. Schurke*, 898 F.3d 904, 919 (9th Cir. 2018). The "RLA does not provide for, nor does it manifest any interest in, national or systemwide uniformity in substantive labor rights." *Id.* States retain their traditional police powers over certain aspects of workplace regulation, including "prohibiting discrimination in employment" and "establishing other worker rights." *Id.* The purpose of RLA preemption is "to reduce commercial disruption by facilitating collective bargaining and achieving industrial peace, not to reduce burdens on an employer by federalizing all of labor and employment law so as to preempt independent state law rights." *Id.* at 920 (internal alterations and citations omitted).

The Ninth Circuit uses a two-part test to determine whether a claim is preempted. *See id.* First, the court should "evaluate the 'legal character' of the claim by asking whether it seeks purely to vindicate a right or duty created by the CBA itself." *Id.* at 920–21. "If a claim arises entirely from a right or duty of the CBA—for example, a claim for violation of the labor agreement, whether sounding in contract or in tort," then it is preempted. But claims are not preempted if they "just refer to a CBA-defined right," "rely in part on a CBA's terms of employment," "run parallel to a CBA violation," or "or invite use of the CBA as a defense." *Id.* at 921 (citing numerous authorities). Second, the court should "ask whether litigating the state law claim nonetheless requires interpretation of a CBA, such that resolving the entire claim in court threatens the proper role of grievance and arbitration." *Id.* Interpretation is "construed narrowly; it means something more than 'consider,' 'refer to,' or 'apply.'" *Id.* (citation omitted). State law claims "are only preempted to the extent there is an active dispute over the meaning of contract terms." *Id.* (internal quotations omitted).

With this guidance in mind, Peterson's Section 432.7 claim is not preempted. First, the legal character of Peterson's claim is not such that "it seeks purely to vindicate a right or duty created by the CBA itself." *See id.* at 920–21. Peterson brings a claim for a right[12]—to not have arrest records

---

[12] Peterson's second claim—for wrongful termination in violation of public policy—is derivative of his Section 432.7 claim, as discussed in more detail below. It too is not preempted, for the same reasons.

that did not lead to conviction used against him—that was created by California law, not by the CBA. This claim is not preempted at the first stage of the test. *See id.* Second, the Court need not interpret the CBA to litigate this claim, as there is no active dispute over the meaning of any contract term. *See id.* at 921. The dispute is whether Amtrak (via Miller, or any other decision maker) improperly considered certain information or records as prohibited by California law. To understand this claim, the Court needs a baseline understanding of the events that occurred leading to Peterson's termination, including the investigation process that took place. The fact that Amtrak followed (or failed to follow) the process laid out in the CBA is irrelevant. Therefore, the Court need not "consider" or "refer to" the CBA in any way. Hence, this claim does not threaten the role of the CBA's investigation process. This claim is not preempted.

Amtrak argues that Peterson "repeatedly argues that Amtrak did not properly or sufficiently investigate Plaintiff's underlying misconduct." Mot. at 26. The Court does not agree with this reading of Peterson's claims. Peterson's claims do not depend on proving that Amtrak failed to sufficiently investigate Peterson's conduct. Rather, Peterson must simply prove that Amtrak used his arrest as a factor. Such proof would not be a collateral attack on the results of Amtrak's investigation.

Amtrak points to *Detomaso v. Pan Am. World Airways, Inc.*, where the court held certain claims preempted. *See* Mot. at 22. In *Detomaso*, the plaintiff brought a defamation claim based on statements made during an investigation pursuant to a CBA. *See Detomaso v. Pan Am. World Airways, Inc.*, 43 Cal. 3d 517, 527–32 (1987). The court held that "statements made to the union representative or during formal or informal disciplinary hearings cannot support a cause of action" and suggested in a footnote that such claims were "inextricably tied" to the CBA *Id.* at 531, 527 n.9. The court explained that "parties to such [a CBA] must be allowed to perform their duties without judicial interference in all but the most outrageous of cases." *Id.* at 530. The court noted that truth is a defense to defamation, and so adjudicating the defamation claim necessarily required relitigating the substance of the investigation. *See id.* at 531. The nature of the claim in *Detomaso*—defamation based upon statements—was significantly different from the claim here. Although statements made during the investigation are relevant to Peterson's claims, as they shed light on what Amtrak

considered, Peterson does not attempt to impose liability based on statements or any other conduct that occurred in the investigation. Rather, Peterson seeks to impose liability for the fact that the investigation considered an improper factor. There is no need to question whether Amtrak's investigation here was fair or whether its conclusions were correct, or to interfere with investigations by imposing liability on specific acts that occur during them. For these reasons, *Detomaso* is distinguishable and does not control here.

Amtrak also cites two nonbinding cases on this issue, neither of which apply here. *See* Mot. at 21. First, in *Hamilton v. Nat'l R.R. Passenger Corp.*, the court held that claims were not preempted, but nevertheless held that preemption operated as an "evidentiary guide." *Hamilton v. Nat'l R.R. Passenger Corp.*, No. 1:19-CV-01986 (TNM), 2020 WL 6781234, *4–*5 (D.D.C. Nov. 18, 2020). The court excluded evidence that "require[d] the Court to interpret the CBA or evaluate Amtrak's compliance with it." *Id.* at *5. Alongside his non-preempted claims, the plaintiff was disputing whether "the investigation and hearing [were] 'fair and impartial' under Rule 24 of the CBA." *Id.* The Court held that such evidence would not be considered in determining the non-preempted claims. *See id.* Similarly, in *Gilmore v. Union Pac. R. Co.*, the Court held that the claims were not preempted, but "[drew] on the preemption doctrine as an evidentiary guide." *Gilmore v. Union Pac. R. Co.*, No. CIV. S-09-2180 KJM, 2012 WL 3205233, *8 (E.D. Cal. Aug. 2, 2012). The Court prohibited the plaintiffs from presenting "evidence of irregularities in the investigation or hearing that led to his or her respective termination," because this would "require an interpretation of the relevant portions of the CBA." *Id.* But the court considered other evidence related to the non-preempted claim. *See id.* at *9.

Here, there is no similarly situated evidence. Peterson does not argue that the hearing was unfair or that Amtrak violated the CBA's terms. If such evidence arises, the Court might reconsider this issue and exclude it as the *Hamilton* and *Gilmore* courts did (although *Hamilton* and *Gilmore* are not binding). But the Court need not reach the question of whether preemption should be an evidentiary limit. At present, there is no otherwise relevant evidence that such a limit would exclude.

In sum, Peterson's claims are not preempted, and the Court finds no need to exclude any evidence on the basis of preemption.

iii.    <u>Peterson's claims are not precluded.</u>

Amtrak argues that Peterson may not challenge the SBA's decision regarding Peterson's termination. This argument also fails.

The Supreme Court has held that a party may only challenge a decision by the SBA on three specific grounds: failure to comply with the requirements of the RLA, failure by the SBA to confine itself to matters within its jurisdiction, and fraud. *Union Pac. R. Co. v. Sheehan*, 439 U.S. 89, 93 (1978). But in *Sheehan*, the plaintiff's challenge to the SBA decision was based on the provisions of the CBA agreement. *See id.* at 90. In *Sheehan*, the SBA held that the plaintiff's claim was time barred (thus not reaching the merits); the plaintiff sought to compel a rehearing on the merits by arguing that the SBA improperly applied tolling rules to the CBA's time requirements. *See id.* The Court noted that the RLA was created "to secure the prompt, orderly and final settlement of grievances that arise daily between employees and carriers regarding rates of pay, rules and working conditions," and that the SBA's effectiveness "depends on the finality of its determinations." *Id.* at 94. Nothing in *Sheehan* suggests that a plaintiff is precluded from challenging an SBA decision on the grounds that the decision considered improper factors as defined by state law rather than the CBA. And no other authority supports such a limit.

The Second Circuit has held that where a reviewing board did not adequately review or protect plaintiff's statutory rights (distinct from CBA rights), the plaintiff may bring a challenge in federal court. *Kulavic v. Chicago & Illinois Midland Ry. Co.*, 1 F.3d 507, 516 (7th Cir. 1993) "[L]egal and factual issues" raised under the Constitution or statutes are generally "beyond the competence of arbitrators whose expertise primarily encompasses industrial relations and the interpretation of CBAs." *Id.* at 518 (citing *Coppinger v. Metro–North Commuter R.R.*, 861 F.2d 33, 39 (2d Cir.1988). Similarly, the Seventh Circuit has held that where an employee first seeks protection via provisions in a CBA, the plaintiff is not later precluded from bringing statutory claims (distinct from the CBA claims) in federal court. *Reed v. Norfolk S. Ry. Co.*, 740 F.3d 420 (7th Cir. 2014). The parties provided no Ninth Circuit authority on this issue, and the Court is aware of none,

1   but the Court finds the reasoning above persuasive and will adopt it.[13] Claims based on statutes are

2   not precluded by an SBA decision that interpreted the CBA.

3          Amtrak also points to *Hill v. Norfolk & W. Ry. Co.*, which Amtrak cites for the rule that a

4   party may not attack a decision "on the basis that it was unfair, contrary to the evidence, or otherwise

5   erroneous." Mot. at 27. But that is not what Peterson is doing here. Peterson is not arguing that the

6   SBA's—or Miller's, or anyone else's—decision was unfair, contrary to the evidence, or erroneous

7   based on the terms of the CBA. Rather, Peterson argues that Amtrak improperly considered a factor

8   which the CBA did not prohibit considering, but that state law prohibited. This action is

9   distinguishable from *Hill*, where the plaintiff "ask[ed] [the court] to interpret the collective

10  bargaining agreement and conclude that the arbitrators erred." *See Hill v. Norfolk & W. Ry. Co.*, 814

11  F.2d 1192, 1196 (7th Cir. 1987). The *Hill* court concluded that it could only review whether the

12  arbitrators were actually interpreting the contract and could not question their interpretation. *Id.* at

13  1195 ("once the court is satisfied that they were interpreting the contract, judicial review is at an

14  end"). Here, Peterson is not asking the Court to interpret the CBA. He is not questioning the SBA's

15  interpretation of the SBA. He is arguing that Amtrak violated state laws that are not contained in the

16  CBA, and the evidence suggests no Amtrak employee made any attempt to interpret or apply these

17  laws. This claim is not precluded by the fact that he went through the CBA's dispute process.

18          iv.   Conclusion as to Section 432.7 Claim

19          For the reasons discussed above, Peterson is entitled to summary judgment that Amtrak

20  violated Section 432.7 by utilizing Peterson's arrest record as a factor in his termination. Summary

21

22

23  [13] The Court also notes that this approach is in accord with the case law in an analogous area, namely

24  preemption under the Labor Management Relations Act (LMRA). *See* 29 U.S.C. § 185 (statute governing
    certain suits "for violation of contracts between an employer and a labor organization representing
    employees"). Claims are preempted by the LMRA if they depend on the interpretation of a CBA. *Lingle v.*

25  *Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405–06 (1988) ("[I]f the resolution of a state-law claim
    depends upon the meaning of a collective-bargaining agreement, the application of state law (which might

26  lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted
    and federal labor-law principles-necessarily uniform throughout the Nation-must be employed to resolve the

27  dispute.") However, "pre-emption merely ensures that federal law will be the basis for interpreting collective-
    bargaining agreements, and says nothing about the substantive rights a State may provide to workers when

28  adjudication of those rights does not depend upon the interpretation of such agreements." *Id.* at 409.

judgment is GRANTED to Peterson as to Amtrak's liability on this claim. For the same reasons, summary judgment is DENIED to Amtrak on this claim.

### B.  Amtrak is not entitled to summary judgment on Peterson's wrongful termination claim (second cause of action).

Amtrak moved for summary judgment on Peterson's claim for wrongful termination in violation of public policy on the grounds that this claim is derivative of the Section 432.7 claim and must fail alongside it. Mot. at 46. Because Peterson's Section 432.7 claim succeeds, as described above, this argument has no merit.

To prevail on a claim for wrongful termination in violation of public policy, a plaintiff must show that his termination violated a "fundamental public policy." *Garcia-Brower*, 269 Cal. Rptr. 3d at 865. Section 432.7 qualifies as a fundamental public policy. *See id.* If Amtrak had not violated any public policy, then this claim would fail. But the Court found above that Amtrak violated Section 432.7. Accordingly, this claim does not fail.[14] Amtrak presents no other arguments in support of its Motion, except to rebut Peterson's fallback arguments.[15] *See* Mot. at 46–48. Amtrak is not entitled to summary judgment on this issue.

The Court further finds that summary judgment in favor of Peterson on this claim would be appropriate under Federal Rule of Civil Procedure 56(f).[16] The parties are hereby given notice under Rule 56(f) of the Court's intent to grant summary judgment in favor of Peterson on the wrongful termination in violation of public policy claims and are hereby provided the opportunity to respond as stated in the Conclusion to this Order.

### C.  Amtrak is entitled to summary judgment on the issue of punitive damages.

---

[14] Amtrak concedes that this claim "will rise and fall with [Peterson's] underlying Section 432.7 claim." Mot. at 46.

[15] Peterson argues that even if the Section 432.7 claim failed, he could still assert his wrongful termination claim based on the public policies of a "constitutional right to privacy," "right to self-defense and his second amendment rights," and "due process and equal protection rights." Mot. at 46–47. The Court need not reach these arguments.

[16] Peterson did not move for summary judgment on this claim. *See* Mot. at 47.

Both Amtrak and Peterson moved for summary judgment on the issue of punitive damages. *See* Mot. at 48–50. As discussed below, no evidence suggests that Peterson may win punitive damages, and so summary judgment will be granted to Amtrak.

There is a high burden to win punitive damages against an employer in California. To win punitive damages, Peterson must show that an "officer, director, or managing agent" engaged in an "act of oppression, fraud, or malice," or consciously disregarded, authorized, or ratified such an act. *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 572 (1999). Mere negligence by the corporation is insufficient. *See id.* Further, managing agents are defined narrowly as "corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy." *Id.* at 566. Even if a manager has authority to hire and fire other employees, that alone is insufficient to establish the manager as a "managing agent." *See id.*

Here, there is no evidence in the record that anyone who would qualify as a "managing agent" under *White* played any role in Peterson's termination. *See White,* Cal. 4th at 572. The highest-ranking employee involved in the termination appears to be Caudill, who authored the letter informing Peterson that he would be terminated. *See* SUF ¶ 34. Peterson conceded that Caudill "does not have the authority to make decisions at the corporate level or determine corporate policy." SAFO ¶ 83. Caudill is thus not managing agent under *White*. *See White,* Cal. 4th at 572. Peterson has presented no facts that suggest any other individual involved was a managing agent. The uncontroverted evidence suggests that the relevant individuals were implementing existing policies and had no policymaking authority.

Peterson's Motion makes a reference to the purported fact that "two different lead in-house attorneys" ratified the decision to terminate Peterson. *See* Mot. at 49. The Court is aware of no evidence supporting this assertion, and notes that this purported fact is not contained in the Statement of Undisputed Facts Peterson submitted. *See* SUF. But even if this were true, no evidence suggests that these in-house attorneys had policymaking authority sufficient to qualify as managing agents under *White*. *White* does not suggest any special test for in-house attorneys or create any rule that an attorney's review of an unlawful decision is sufficient for punitive damages.

1    Because no evidence would support the imposition of punitive damages, Amtrak is entitled to

2    summary judgment on Peterson's prayer for punitive damages and summary judgment in its favor is

3    GRANTED.

4        **D.    Amtrak's alternative conduct-based affirmative defenses fail as to the Section**

5            **432.7 claim.**

6    Peterson moves for summary judgment that certain affirmative defense do not apply to

7    Section 432.7. Specifically, Peterson seeks summary judgment on the following affirmative

8    defenses: DOT Regulations (9th affirmative defense); Lawful Investigation and Consideration of

9    Facts Beyond Arrest Record (11th affirmative defense); Impossibility of Plaintiff's Continued

10   Service (12th affirmative defense); Business Necessity (15th affirmative defense); Legitimate

11   Business Reasons (17th affirmative defense); After-Acquired Evidence (20th affirmative defense);

12   and Disqualifying Factor (22nd affirmative defense). *See* Mot. at 52–55; *see also* Answer. The

13   parties each describe these as "alternative conduct-based affirmative defenses." *See* Mot. at 53, 59.

14   Peterson argues that alternative conduct-based affirmative defenses are not available to a

15   Section 432.7 claim. Peterson notes that Section 432.7 prohibits using arrest records as "a factor,"

16   suggesting that even if other legitimate factors were also considered, the improper consideration of

17   an arrest record is a violation. Amtrak responds that no authority squarely prohibits these defenses,

18   and notes that California courts have held that alternative conduct-based affirmative defenses apply

19   to other statutes even if not explicitly mentioned in the statutes' text.

20   Amtrak cites *Harris v. City of Santa Monica*, where the Supreme Court of California held

21   that a "mixed motive" affirmative defense is available to discrimination claims brought under the

22   California Fair Employment and Housing Act ("FEHA"). *See Harris v. City of Santa Monica*, 294

23   P.3d 49, 72 (Cal. 2013). However, FEHA's text is significantly different than that of Section 432.7.

24   FEHA prohibits to discriminate "because" of a protected characteristic (race, religion, etc.). *See id.*

25   at 53–54; *see also* Cal. Gov. Code. § 12940. Section 432.7 does not prohibit disciplining an

26   employer because of an arrest record, and rather prohibits using the arrest record "as a factor" in

27   discipline. Cal. Lab. Code § 432.7(a)(1). This suggests a different standard that of FEHA and

28   supports the conclusion that a "mixed motive" (where the arrest record was one of many factors

considered) should not be a defense. Further, it is worth noting that *Harris* did not find that an employer's showing that they would have reached the same decision absent considering protected characteristic is "a complete defense to liability." *See Harris*, 294 P.3d at 61. Rather, so long as a FEHA plaintiff can show that a protected characteristic was a "substantial factor motivating the adverse employment action," the plaintiff may recover damages. *See id.*

The Court is not aware of any authority directly addressing whether mixed motive or alternative conduct-based defenses are available under Section 432.7.[17] It appears that Amtrak's affirmative defenses merely point to other legitimate bases upon which Peterson could have been terminated. Amtrak argues that Affirmative Defense No. 9 is permissible because under DOT Regulations, Peterson could have been decertified due to his illegal drug use and would no longer have been qualified to work as a locomotive engineer. Mot. at 56–57. With respect to the remaining affirmative defenses enumerated above, Amtrak explains that these defenses are permissible because Amtrak "did not violate the law by terminating Plaintiff's employment in accordance with applicable policies and the CBA supported by its legitimate business reasons for that decision, none of which were factored on Plaintiff's arrest or detention." Mot. at 59. To the extent that the basis of these affirmative defenses is that Peterson's termination was not based on his arrest, the Court has already addressed this above. To the extent that the basis of these affirmative defenses is that Peterson's termination was justifiable for reasons other than the arrest, they fail. The plain text of the statute makes clear that utilizing prohibited records as a factor is unlawful. *See* Cal. Lab. Code § 432.7(a)(1). Accordingly, the Court holds that the alternative conduct-based defenses asserted in this case are not available to Amtrak on the record before the Court. Because Amtrak considered the arrest record as a factor, that alone is sufficient for liability, even though it also may have considered other factors and even though other facts may have been sufficient on their own to justify the termination decision.

### E. Amtrak's res judicata affirmative defense fails.

---

[17] Because the parties did not brief the issue, the Court makes no holding on whether these defenses are available in response to the wrongful termination in violation of public policy claim. The parties may address this issue in the responsive briefing described in the conclusion to this Order if they so desire.

Peterson moves for summary judgment on Amtrak's affirmative defense of "Res Judicata; Prior Claims and Decisions" (10th affirmative defense). Mot. at 59–61; *see also* Answer ¶ 10. Amtrak's Answer describes this defense as encompassing "res judicata, issue preclusion, judicial estoppel, and equitable estoppel." Answer ¶ 10. The Court finds that no evidence supports this defense.

No evidence suggests that res judicata, estoppel, or any form of preclusion bar Peterson's claims. Peterson's claim at issue here—that Amtrak improperly considered his arrest records—has never been litigated or argued in any other forum. Although, as Amtrak notes, arbitration proceedings can have preclusive effect in federal court (*see* Mot. at 62, citing *DotConnectAfrica Tr. v. Internet Corp. for Assigned Names & Numbers*, 284 Cal. Rptr. 3d 135, 147 (2021)), Amtrak would need to present some evidence for this defense to survive summary judgment. There is no evidence that Section 432.7 was considered at any stage of the proceedings. *See* ECF No. 46-7; ECF No. 46-12; ECF No. 46-13 (various written decisions which do not mention Section 432.7). Nor is there any evidence that Peterson has taken any position contrary to the ones he takes here.

Finally, Amtrak argues that Peterson's motion is premature, implying that some estoppel doctrines may be implicated were Peterson to testify contrary to his testimony at his criminal trial or his investigatory hearing or appeal.  *See* Mot. at 62. Were Peterson to do so, this would not implicate res judicata, but merely possible impeachment. The res judicata defense asserted is not relevant and not available to Amtrak.

### F. Peterson is entitled to summary judgment on Amtrak's good faith defenses because of the Court's ruling on punitive damages.

Peterson moves for summary judgment that Amtrak's "good faith defenses"— Managerial Privilege (14th affirmative defense); Good Faith (16th affirmative defense); and Authorized / Required to Receive the Information (18th affirmative defense)—are not applicable to Section 432.7. *See* Mot. at 64; *see also* Answer. Amtrak's sole argument in response is that these are relevant to punitive damages. *See* Mot. at 65. Peterson responds that they should not be considered unless punitive damages are considered. *See id.*

The Court determined that summary judgment will be granted to Amtrak on punitive damages, as described above. With punitive damages no longer in play, these defenses are no longer relevant. *See* Mot. at 65. Accordingly, summary judgment will be GRANTED to Peterson as to these defenses.

### G. Peterson is entitled to summary judgment that other affirmative defenses do not apply.

Peterson moves for summary judgment on four other affirmative defenses, on the grounds that Amtrak failed to present evidence that would create a triable issue of fact. These are: Failure to Exhaust Administrative Remedies (13th affirmative defense); Failure to Exhaust Internal Remedies (19th affirmative defense); Outside Course and Scope of Employment (21st affirmative defense); Federal Employers Liability Act Preemption (23rd affirmative defense). *See* Mot. at 63–66.

Amtrak made no attempt to oppose or rebut Peterson's arguments on these affirmative defenses. *See* Mot. at 63–66. Further, the Court sees no evidence that would support these defenses. No evidence suggests that Peterson was obligated to exhaust any remedy (administrative or internal) and failed to do so. No evidence suggests any Amtrak employee was acting outside the scope of his or her employment during relevant events. And the Federal Employee Liability Act—which governs personal injury actions for railroad employees, *see* 45 U.S.C.S. §§ 51-60—does not appear to have any application to Peterson's claims. Peterson is entitled to summary judgment on these issues.

### V.   Conclusion

For the reasons stated herein, the Court ORDERS the following:

1. Summary judgment is GRANTED to Peterson that the following affirmative defenses do not apply: DOT Regulations (9th affirmative defense); Res Judicata [and] Prior Claims and Decisions (10th affirmative defense); Lawful Investigation and Consideration of Fats Beyond Arrest Record (11th affirmative defense); Impossibility of Plaintiff's Continued Service (12th affirmative defense); Failure to Exhaust Administrative Remedies (13th affirmative defense); Managerial Privilege (14th affirmative defense); Business Necessity (15th affirmative defense); Good Faith (16th affirmative defense); Legitimate Business Reasons (17th affirmative defense); Authorized / Required to Receive the Information

(18th affirmative defense); Failure to Exhaust Internal Remedies (19th affirmative defense); After-Acquired Evidence (20th affirmative defense); Outside Course and Scope of Employment (21st affirmative defense); Disqualifying Factor (22nd affirmative defense); and Federal Employers Liability Act Preemption (23rd affirmative defense).

2.  Summary judgment is GRANTED to Peterson on his first cause of action for violation of Section 432.7. Further proceedings will be held to determine the amount of damages. The parties shall meet and confer and file a joint proposal with respect to these further proceedings within fourteen (14) days of this Order.

3.  Summary judgment is DENIED to Amtrak on both Peterson's first cause of action for violation of Section 432.7 and Peterson's second cause of action for wrongful termination.

4.  The parties are hereby NOTIFIED of the Court's intent to grant summary judgment Peterson pursuant to Rule 56(f) on his second cause of action for wrongful termination in violation of public policy. The parties each must file any response thereto within fourteen (14) days of this Order.

5.  Summary judgment is GRANTED to Amtrak on Peterson's prayer for punitive damages.

6.  Summary judgment is DENIED to Peterson on his prayer for punitive damages.


IT IS SO ORDERED.


Dated: September 1, 2023

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge